UNITED STATES of America, Appellee,

v.

Howard S. RUGGLES, Jr., Defendant–Appellant.

No. 125, Docket 95–1079.

United States Court of Appeals, Second Circuit.

Argued Sept. 13, 1995.

Decided Nov. 20, 1995.

Thomas A. Zonay, Rutland, Vermont (Carrol, George & Pratt, Rutland, Vermont, of counsel), for Defendant–Appellant.

Gary G. Shattuck, Assistant United States Attorney, Rutland, Vermont (Charles R. Tetzlaff, United States Attorney, David V. Kirby, Chief, Criminal Division, Rutland, Vermont, of counsel), for Appellee.

Before NEWMAN, Chief Judge, VAN GRAAFEILAND and PARKER, Circuit Judges.

VAN GRAAFEILAND, Circuit Judge:

Howard S. Ruggles, Jr. appeals from a judgment of the United States District Court for the District of Vermont (Billings, J.) which followed his conditional plea of unlawful possession of a firearm by a convicted felon. 18 U.S.C. § 922(g)(1). In the plea agreement, Ruggles reserved the right to appeal the district court's denial of his motion to suppress. He now challenges this ruling, claiming that his confession and consent to search were given involuntarily. Ruggles also appeals his sentence, calculated pursuant to U.S.S.G. § 2K2.1, contending

that the district court erroneously believed it did not have authority to depart downward. For the reasons that follow, we affirm both the judgment and sentence.

In September 1993, before Ruggles was to begin a state-imposed sentence for violation of probation, he purchased and gave his wife a single-shot 20 gauge shotgun. Ruggles thought the gun would provide for her safety while he was in jail. During Ruggles' sentence, his wife filed for divorce, and after his release, removed her property from their house. While taking her belongings, Ruggles' wife noticed that the shotgun and some ammunition were missing. When she later encountered Ruggles, he admitted to having taken the gun. At this point, Ruggles retrieved the shotgun from his mother's house, where he was living at the time, and offered to return it to his wife. She refused the offer, but noticed that the gun had been altered; the stock had been cut off and the barrel had been shortened.

After Ruggles returned to his mother's house with the gun, his wife telephoned Detective Sergeant Barci of the Vermont State Police and told him that she had seen Ruggles with the altered shotgun. Sergeant Barci contacted the United States Bureau of Alcohol, Tobacco, and Firearms ("ATF"). Based on a police affidavit recounting these events, a search warrant was issued authorizing a search of Ruggles' mother's house. Four days later, police and ATF agents searched the premises.

The agents found some ammunition but not the gun. They asked Ruggles' mother where he could be found. She did not know, but referred them to Ruggles' probation officer. An ATF agent then called Ruggles' probation officer and asked if he would have Ruggles come to the Bennington Probation Office later that day. A meeting was scheduled for 1:30 p.m. and Ruggles reported to his probation officer, John Driscoll, at the scheduled time.

When Ruggles arrived, Driscoll told him that two law enforcement officials wanted to speak with him. He did not say anything else. Ruggles then met with ATF Special Agent James Dobson and Sergeant Barci in one of the probation department's offices.

Dobson told Ruggles that he was free to leave, that he was not under arrest, and that he did not have to speak with the agents. Ruggles acknowledged that he understood this. Dobson then read Ruggles his *Miranda* rights and Ruggles signed and acknowledged the statement of his rights.

When Dobson read the waiver section of the *Miranda* rights, Ruggles stated that he did not know whether he wanted to talk, or whether he should get an attorney. The agents told him that it was his decision to make; he could stop the interview at any time; he did not have to speak; and he could have an attorney present. Dobson said that if Ruggles did not make his intention clear, Dobson would leave.

Ruggles then signed a waiver of his *Miranda* rights and began to speak with the agents. Dobson stated that it would be to Ruggles' benefit to cooperate and that his cooperation would be brought to the attention of the prosecutor. Dobson also said that his office was in Burlington and that he did not travel very often to the area where Ruggles lived. He told Ruggles that he would interview him only on that day.

Ruggles initially denied having a shotgun. However, when the agents told him he was lying, he admitted having a gun and said he had fired it behind his garage. He then was taken to police barracks to give a written statement. While there, Ruggles also signed a written consent to search. ATF agents conducted a search and found Ruggles' sawed-off shotgun.

Ruggles was indicted on charges relating to possession of the sawed-off shotgun. He then filed the motion to suppress, the denial of which is the principal issue on this appeal. The district court denied the motion, stating that "the defendant was never in custody, and he voluntarily and knowingly waived his *Miranda* rights" and "[t]he Court finds that all statements made by the defendant, and the evidence derived therefrom, were voluntarily given." After carefully reviewing the record, we agree.

In making this review, we considered, as we are required to do, "the totality

of all the surrounding circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 226, 93 S.Ct. 2041, 2047–48, 36 L.Ed.2d 854 (1973). This included Ruggles' background and experience, the conditions of his interrogation and the conduct of the law enforcement officers. *See United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991); *United States v. Mast,* 735 F.2d 745, 749 (2d Cir.1984); *United States v. Price,* 599 F.2d 494, 503 (2d Cir.1979). Looking first to Ruggles' background and experience, we noted that he is familiar with police questioning. He has an extensive criminal record, including convictions for eleven prior offenses. Indeed, he was arrested by one of the investigators in this case on at least four occasions. Moreover, there is nothing in the record to indicate that he lacks maturity, education or intelligence; he was twenty-eight years old at the time of questioning. He was familiar with his *Miranda* rights, including the right to remain silent. Echoing the words of the Supreme Court in *United States v. Watson,* 423 U.S. 411, 424–25, 96 S.Ct. 820, 828–29, 46 L.Ed.2d 598 (1976), "[t]here is no indication in this record that [Ruggles] was a newcomer to the law, mentally deficient, or unable in the face of a custodial arrest to exercise a free choice."

■ Unlike the defendant in *Watson,* Ruggles was not in custody at the time he conferred with the law enforcement agents. A defendant is in custody when "a reasonable person in the defendant's position would have understood himself to be 'subjected to restraints comparable to those associated with a formal arrest.'" *United States v. Mitchell,* 966 F.2d 92, 98 (2d Cir.1992) (quoting *Berkemer v. McCarty,* 468 U.S. 420, 441, 104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984)). The district court found that Ruggles was not in custody, a determination that is reviewed only for clear error. *Id.* There was no such error here. It is undisputed that Ruggles' probation officer did not tell Ruggles that he had to talk to the police officers. It also is undisputed that the police officers told Ruggles that he was not under arrest; that he did not have to talk with them, and could leave at any time. Ruggles' position, as expressed in his brief on appeal, was that "the special circumstances of defendant's

questioning made it clear that he knew he was *not* free to leave until the agent released him." Assuming the existence of such unlikely and unjustified "knowledge" on Ruggles' part, it is undisputed that the agents proffered Ruggles his "release" on several occasions. Under the circumstances, the role of custodians cannot be thrust upon them.

■ We are not persuaded by Ruggles' argument that his statements to the police were the result of psychological coercion. Material misrepresentations based on unfulfillable or other improper promises might perhaps overbear a defendant's will. *See Brady v. United States,* 397 U.S. 742, 755, 90 S.Ct. 1463, 1472–73, 25 L.Ed.2d 747 (1970); *United States v. Fisher,* 700 F.2d 780, 783 (2d Cir.1983). However, "'a confession is not involuntary merely because the suspect was promised leniency if he cooperated with law enforcement officials.'" *United States v. Bye,* 919 F.2d 6, 9 (2d Cir.1990) (quoting *United States v. Guarno,* 819 F.2d 28, 31 (2d Cir.1987)); *see also United States v. Jaswal,* 47 F.3d 539, 542 (2d Cir.1995). Certainly, statements to the effect that it would be to a suspect's benefit to cooperate are not improperly coercive. *See United States v. Pomares,* 499 F.2d 1220, 1222 (2d Cir.), *cert. denied,* 419 U.S. 1032, 95 S.Ct. 514, 42 L.Ed.2d 307 (1974); *United States v. Ferrara,* 377 F.2d 16, 17–18 (2d Cir.), *cert. denied,* 389 U.S. 908, 88 S.Ct. 225, 19 L.Ed.2d 225 (1967). Statements such as these are merely common sense factual observations. *See United States v. Jaswal, supra,* 47 F.3d at 542; *United States v. Shears,* 762 F.2d 397, 402 n. 3 (4th Cir.1985). Indeed, after Ruggles admitted to previous arrests in Vermont where *Miranda* warnings were given him, he testified that, on those occasions, when he spoke with an officer, he believed that he would benefit by giving information. "Once [Ruggles] had been advised of his rights, the agents were free to discuss with him the evidence against him and the reasons why he should cooperate." *United States v. Tutino,* 883 F.2d 1125, 1138 (2d Cir.1989), *cert. denied,* 493 U.S. 1082, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990).

■ There was nothing improperly coercive about Agent Dobson's statement that his office was in Burlington, that he didn't travel to Bennington much, and that the day of the interview was the only day that he would be interviewing Ruggles. No coercion resulted from Dobson's proper statements that he would not talk to Ruggles if Ruggles did not sign the *Miranda* waiver. Dobson was only repeating instructions given him by the courts.

In sum, we hold that the district court's finding that Ruggles' statements to the police were given voluntarily was not clearly erroneous and should not be set aside. *See United States v. Tutino, supra,* 883 F.2d at 1138; *United States v. Mast, supra,* 735 F.2d at 749; *United States v. Isom,* 588 F.2d 858, 862 (2d Cir.1978); *United States v. Boston,* 508 F.2d 1171, 1175 (2d Cir.1974), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975). The district court did not err in denying Ruggles' motion to suppress.

■ Ruggles' challenge to his sentence is equally without merit. His conviction was based upon his possession of a sawed-off shotgun. His original explanation of his possession was contained in his written statement to Agent Dobson on February 1, 1994. It read in pertinent part as follows:

In 1989 I was convicted in Vermont of the crime of cultivation of marijuana. I know I was not supposed to have firearms because of this conviction.

About two years ago I purchased a single shot 20 gauge shotgun, (it was a break open shotgun and I think it said Partner on it) from my nephew Jason Becker. Becker is around 17 years old now and lives in Bennington, Vermont. I paid Becker $40–50 for the shotgun.

I gave this shotgun to my wife Jeanna. I gave it to her for protection.

My wife and I have had problems and have been separated at various times since I gave her the gun. However the gun was hers and it was kept in the place we lived.

About a week and half ago I went to where Jeanna was living. She had left the place unlocked and I thought stuff would be stolen. I took the shotgun and a box of 25 rounds of ammunition. I took the gun and ammo to my mothers. I knew I was not supposed to have the gun because of the felony, but I did not know I could not have ammunition.

The next day I got the gun out and cut off the barrel and the stock. I knew this was illegal and I don't know why I did it. I then fired about four rounds of ammo behind the garage. The barrel is in the garage under the bench or near there. The shotgun is under the truck on the frame where I hid it.

I used a hacksaw with a thin blade. The hacksaw is in the kitchen by the door.

I have signed a consent form authorizing agents to go back to the house and get the gun.

Ruggles swore that this statement was true. If so, Ruggles' conduct fell squarely within the "heartland" of guideline § 2K2.1. Each guideline carves out a "heartland," a "set of typical cases embodying the conduct that each guideline describes," *United States v. Lara,* 975 F.2d 1120, 1124 (5th Cir.1992) (quoting U.S.S.G. ch. I, pt. A(4)(b) at 1.5–1.6 (policy statement)), here unlawful possession of firearms or ammunition by a convicted felon. The weapon that Ruggles made and possessed was a sawed-off shotgun which courts have described as "inherently dangerous and generally lacking usefulness, except for violent and criminal purposes," *United States v. Dunn,* 946 F.2d 615, 621 (9th Cir.), *cert. denied,* 502 U.S. 950, 112 S.Ct. 401, 116 L.Ed.2d 350 (1991), and also have stated that possession of such a gun "involves the substantial risk of improper physical force." *United States v. Hayes,* 7 F.3d 144, 145 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1403, 128 L.Ed.2d 76 (1994). These are common sense observations of which the learned district judge, who has many years' experience as both a state and federal judge, was fully aware. It would have been surprising indeed if the district judge had rejected Ruggles' above-quoted sworn statement in favor of Ruggles' last-minute sentencing assertion that he altered and kept the gun so that he could use it in committing suicide. The court was eminently correct in holding

that Ruggles' creation and possession of the sawed-off shotgun was in the "heartland" of section 2K2.1 cases, which are made applicable to both 18 U.S.C. § 922 and 26 U.S.C. § 5861(a)–(e), and in its refusal to grant a downward departure.

The judgment of the district court is affirmed in all respects.